**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **DR. KIRSTEN KATZEN AND JASMINE MCELHANY,** | § | |
| **Plaintiffs,** | § | |
| | § | **CIVIL ACTION NO.** |
| **v.** | § | |
| | § | **3:26-CV-01019** |
| **UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL CENTER,** | § | |
| **Defendant.** | § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

## I.

## INTRODUCTION

1. Plaintiffs Dr. Kirsten Katzen (Dr. Katzen) and Jasmine McElhany (McElhany) (collectively Plaintiffs) file this First Amended Complaint against Defendant University of Texas Southwestern Medical Center (UTSW).

## II.

## INTRODUCTORY STATEMENT

2. The University of Texas Southwestern Medical Center (UTSW) is a public academic health science center in Dallas, Texas, with more than 23,000 employees, more than 3,000 full-time faculty, and nearly 4 million outpatient visits per year. UTSW is the largest medical school in the University of Texas System and the State of Texas.

3. On January 31, 2025, Texas Governor Greg Abbott issued Executive Order GA 55. GA 55 directed all state agencies to end all Diversity, Equity, and Inclusion (DEI) programs within all state of Texas agencies.

4. Certain individuals within UTSW ignored this directive and continued to actively and publicly promote such programs.

5. For example, UTSW continued to use the Application Holistic Review Guide after the Governor's Order.

6. This guide stressed "continued commitment to diversity, equity and inclusion."

7. UTSW's admissions process specifically required "diversity" factors, including "[s]elf-identified ethnic minority."

8. Whether applicants were even given interviews for UTSW programs was dependent on this "holistic evaluation of the entire application and not solely on academic criteria such as GPA or GRE scores."

9. Additionally, these same individuals who simply ignored the Governor's Order also repeatedly discriminated against and harassed Dr. Katzen and McElhany simply for being white.

10. These individuals' actions not only violated federal law, they directly contravened the directives of Governor Abbott and the state of Texas.

## III.

## PARTIES

11. Dr. Katzen is an individual and a citizen of Dallas County, Texas.

12. McElhany is an individual and a citizen of Collin County, Texas.

13. UTSW is a state of Texas owned and operated medical center. UTSW is a governmental entity with its principal place of business located 5323 Harry Hines Blvd., Dallas, Texas 75390. USW may be served with process, including citation and a copy of this petition, by serving its registered agent for service of process, Daniel K. Podolsky, M.D., 5323 Harry Hines Blvd., Dallas, Texas 75390.

**IV.**

**JURISDICTION**

14. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs assert claims arising under federal law.

15. UTSW employs the requisite number of employees for coverage under the relevant federal statutes upon which Plaintiffs' claims are based.

**V.**

**VENUE**

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because UTSW resides in Dallas County, and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in Dallas County.

17. Dallas County lies within the Dallas Division of the Northern District of Texas, as set forth in 28 U.S.C. § 124(a)(1).

**VI.**

**FACTS**

18. Dr. Katzen and McElhany are white females.

19. Dr. Katzen is married to a Jewish man.

20. Dr. Katzen's husband, children, and in-laws are Jewish.

21. Dr. Katzen and her family are all members of Congregation Shearith Israel.

22. Dr. Katzen started working at UTSW in December 2022 as an Assistant Professor of Physician Assistant studies, and was the course director for the emergency medicine clinical block, pediatric clinical block, and didactic course emergency medicine orthopedics and rheumatology and HEENT block.

23. McElhany started working for UTSW in January 2021.

24. McElhany started working as an Assistant Professor of Physician Assistant studies, and was the women's health clinical course director, pulmonology course director, gastroenterology course director, and integration skills course small group leader at UTSW in June 2023.

25. McElhany was also the lung transplant PA at Clements University Hospital.

26. Throughout their time with UTSW, both Dr. Katzen and McElhany were subjected to racism and retaliation by Veronica Coleman (black female), the Director of Admissions, Temple Howell-Stampley (black female), the Physician Assistant Department Program Director and Chair, and others.

27. During Dr. Katzen's very first one-on-one meeting with Coleman to discuss transition of Emergency Medicine clinical course responsibilities in early May 2023, Coleman called Dr. Katzen a "Karen" and said she "knows your type," and accused Dr. Katzen of trolling Facebook making negative comments about diversity, equity, and inclusion (DEI) on the PA mom's group.

28. Dr. Katzen tried to explain to Coleman that that was not her.

29. Coleman told Dr. Katzen she knew her husband, who is a surgeon, had trained in the South, and she told Dr. Katzen she was biased against white men from the South.

30. Dr. Katzen tried to explain to her that Dr. Katzen's husband was actually a Jewish man raised by parents and family from South Africa and only trained in the South.

31. Dr. Katzen then reported this to Howell-Stampley, who said, "Wait a minute, I'm going to get Veronica [Coleman]."

32. Howell-Stampley then left Dr. Katzen in the room for about an hour and a half, as she talked to Coleman.

33. When Coleman and Howell-Stampley finally came into Dr. Katzen's room, Howell-Stampley told Dr. Katzen, "I don't know you, but I know Veronica, and she's good people. I don't know what you're angling for," or words to similar effect.

34. On McElhany's first day with the PA Program in May 2023, she had a meeting with Dr. Howell-Stampley where she said, in a very condescending tone, "I know exactly who you were and what kind of student you were in PA school."

35. McElhany had her first meeting with Coleman on or about June 7, 2023, where she talked with McElhany about her role in the department and the Admissions process, specifically focusing on the holistic nature of admissions as well as the mission and vision of the PA Program.

36. Coleman introduced the term "mission fit" candidate.

37. Coleman stated, "Some people have a high GPA but no life experience and just float along through high school and undergrad; they really struggle in PA school, especially if they go straight through from undergrad."

38. McElhany told her that she went straight through from undergrad to PA school and did not struggle; Coleman cut her off before she could share that she did have a lot of life experiences that prepared her for the rigor of PA school.

39. Coleman said, "Well some people do just have it easy in life."

40. During multiple admission meetings Coleman made statements about looking for candidates who are not white.

41. Coleman stated multiple times, "We need students that are 'mission fit.'"

42. The mission included diversity, equity and inclusion statements.

43. When McElhany was initially hired, Carolyn Bradley-Guidry (black female) told McElhany on June 26, 2023, she was glad to have her there, but that she was even more excited about Arlene Betancourt (Puerto Rican/female) because she was "Latinx," and that "We don't need more white people here," or words to similar effect, while referencing the program's mission and vision DEI commitment.

44. During another meeting involving Dr. Katzen and Coleman in summer 2023, Coleman was discussing religious exemptions for a Muslim student who wanted to take a pilgrimage for his religion.

45. Coleman said, "If we approve that, every Jewish kid with a big star of David around his neck is going to demand random days off for 'yom kipper,'" or words to similar effect.

46. When Dr. Katzen told her that Yom Kippur is the most holy day in the Jewish faith, and told her that her husband is Jewish, Coleman rolled her eyes and said, "Well they'll be demanding days off like they always do," or words to similar effect.

47. During an implicit anti-bias training session on July 11, 2023, involving both Dr. Katzen and McElhany, and hosted by Bethany Grubb (white female) and Carolyn Bradley-Guidry (black female), the Dean of DEI, Dr. Samarpita Sengupta (Indian female) said her bias was against white females.

48. Coleman and Howell-Stampley agreed.

49. Coleman then said her bias was against white men.

50. Coleman said that white male applicants to the UTSW program had to do a lot more to gain admission to the program because of her bias against them.

51. Coleman said this multiple times over the years during admissions meetings and faculty training sessions for admissions.

52. During the Implicit Bias training session on July 11, 2023, there was an exercise where pictures of random people were shown and the faculty and staff were asked to comment on if they found the person trustworthy based on their appearance.

53. This was an exercise where everyone went around the room and shared their initial impression of the people in the photos.

54. When it was McElhany's turn, there was a white woman and McElhany commented, "My initial response is that I trust her because she looks like me."

55. Coleman said, "I can tell by her eyes that she is not trustworthy-that is my impression."

56. It turned out that the photo was of the con-artist Anna Sorokin.

57. After this was revealed, Coleman proudly commented, "I can always tell about these things!"

58. McElhany then observed that Coleman did not trust any of the people pictured if they were white.

59. On October 2, 2023, Howell-Stampley scheduled a "Check In" meeting for October 4, 2023.

60. During this meeting, Howell-Stampley asked McElhany whether she felt she was "a good fit for this role and the department" and raised concerns about "office gossip."

61. McElhany stated she was not engaged in gossip and questioned the basis for the concern.

62. After the Hamas attacks in Israel in October 2023, two Palestinian students came to Dr. Katzen to ask if there was any support for them.

63. When Dr. Katzen spoke to Howell-Stampley, she said, "Jews don't need to be worried because [Dr. Daniel] Podolsky is president [of UTSW], we're not getting involved in this. It's not like it's a George Floyd incident," or words to similar effect.

64. At a Clinical Team meeting on or about November 15, 2023, Coleman said that Dr. Dekat continued to use two preceptors because she was racist.

65. Coleman repeated this allegation in a separate meeting on that same date.

66. Going forward, during multiple Clinical Team meetings, both Coleman and Bau alleged that Dr. Dekat was "a racist" for keeping two clinical preceptors who Bau and Coleman said they suspected were racist towards students.

67. During a clinical team meeting involving both Dr. Katzen and McElhany on November 29, 2023, Bau Tran (Vietnamese male), who is the Director of Interprofessional Practice and Education, was upset that a black female student received a poor score from a preceptor.

68. Dr. Katzen explained to him that she was aware of the score and that there was general consensus that this student was not engaged and seemed uninterested in seeing patients.

69. Tran exploded at Dr. Katzen.

70. Tran started banging on the table and screaming at Dr. Katzen.

71. Tran said, "If you're not taking care of students and taking this seriously, then you're a racist," or words to similar effect.

72. Tran then pointed his finger in Dr. Katzen's face and said, "When you're not here in a year from now, we need to know how you documented this."

73. At that point Dr. Katzen and McElhany were both genuinely concerned that Tran might attack Dr. Katzen physically, so Dr. Katzen left the meeting.

74. Dr. Katzen knew at least four people went to Howell-Stampley about this, and another person emailed Howell-Stampley about this.

75. McElhany emailed Howell-Stampley about this incident on November 29, 2023, and met with Howell-Stampley in person to tell her that she, too, did not feel safe around Tran given his outburst.

76. Howell-Stampley told McElhany, "Get to know him better. Don't put me in the middle of a drama triangle," or words to similar effect.

77. Despite reiterating that she did not feel comfortable meeting with Tran alone, Howell-Stampley insisted that McElhany deal with the issue herself.

78. On November 30, 2023, Dr. Katzen met with Howell-Stampley, who said that Dr. Katzen needed to get to know Tran and that Dr. Katzen had triggered him.

79. Howell-Stampley then told Dr. Katzen she needed to meet with Tran one-on-one, and she did not want to be involved.

80. Dr. Katzen told Howell-Stampley she did not feel safe meeting with Tran one-on-one.

81. Howell-Stampley said she did not want to be involved and rolled her eyes.

82. Howell Stampley then said, "You let me know when you're done with this," or words to similar effect.

83. To Dr. Katzen's knowledge no disciplinary action was ever taken against Tran for this.

84. Executive Order GA-55 was discussed during faculty meetings in 2024 as was the 2023 Supreme Court decision banning race-conscious admissions at colleges.

85. Despite awareness of both, the department did not revise its mission and vision statements or admissions policies.

86. Furthermore, at one point in a faculty meeting Carolyn Bradley-Guidry (the current Professor and School of Health Professions Associate Dean of Student Affairs and Engagement, who at the time of this faculty meeting, held the official title of SHP Assistant Dean for Diversity, Inclusion, and Equity Affairs), stated, "Even though Abbott is getting rid of DEI, all we are doing is changing the name of the office—nothing else in effect will change in our data to day activities" when discussing how the UTSW SHP was responding to Executive Order GA-55.

87. In late March 2024, a black student complained to Coleman about the same preceptor being rude to her.

88. Dr. Katzen met with Heather Salinas (white female), the Physician Assistant Program Clinical Coordinator and Project Manager, and Howell-Stampley, and all agreed for Dr. Katzen and Salinas to meet with the student.

89. Coleman learned that she was not included in the meeting (it was not protocol for her to be involved in this meeting), and she sent Dr. Katzen an email accusing Dr. Katzen of intentionally leaving her out of the meeting knowing that the student wanted her involved.

90. Dr. Katzen did not know the student wanted her involved.

91. Dr. Katzen then sent a Zoom invite to Coleman, Salinas, and the student with an exclamation point about the meeting.

92. Howell-Stampley then accused Dr. Katzen of trying to intimidate a black student (because of the exclamation point).

93. Howell-Stampley then accused Dr. Katzen of being the ringleader of people who gave her negative reviews (these reviews are anonymous), and Howell-Stampley told Dr. Katzen she was actively trying to find out who wrote what about her in these yearly performance reviews.

94. During the same meeting on April 4, 2024, Howell-Stampley said, “Maybe you’re not a good fit for the program,” or words to similar effect.

95. Howell-Stampley also reminded Dr. Katzen that yearly contracts were approaching and Howell-Stampley said she “won’t be renewing toxic employees.”

96. When Dr. Katzen asked if that was directed at her, she replied, “Well what do you think?”

97. Dr. Katzen told Howell-Stampley that the work environment was hostile, and this had increased since the incident with Tran.

98. Howell-Stampley said, “Sounds like you have PTSD and you should find someone to talk to, as I am not it,” or words to similar effect.

99. Dr. Katzen said there were no actions taken against Tran and Howell-Stampley told Dr. Katzen this was none of her business.

100. During the Fall 2024 Physician Assistant Education Association (PAEA) Forum in New Orleans (October 11–14, 2024), all faculty were encouraged to attend.

101. McElhany, Katzen and two other white female faculty (Michel Statler and Laura Mattingly) were excluded from social and professional activities during the conference by Howell-Stampley and Coleman.

102. Eventually Dr. Katzen gave her notice as she could no longer work in this racially hostile environment.

103. When Dr. Katzen resigned, she informed the dean's office that it was due to a toxic work environment.

104. An exit interview was not offered, although this was standard for other employees that had left the department.

105. After Dr. Katzen left, Howell-Stampley regularly told people Dr. Katzen was racist.

106. After Dr. Katzen left, she filed a compliance complaint with UTSW concerning this toxic and racist environment.

107. After Dr. Katzen left, Michael Statler (white female) filed a compliance complaint.

108. While McElhany was participating in that investigation, she had her job duties as a lung transplant PA removed.

109. Professor Sadaf Charania joined the department around the time of Katzen's departure and assumed responsibility for Katzen's former faculty mentees.

110. McElhany asked Charania whether she had communicated with Katzen regarding the transition.

111. Charania informed McElhany she had been advised by Howell-Stampley not to discuss the mentee transition with Katzen and that she was specifically instructed to "stay away from [McElhany] and [Dr. Katzen]."

112. During McElhany's one-on-one with Coleman for an admissions calibration discussion on June 12, 2024, she said, "I noticed there's just something going on with your face sometimes," or words to similar effect.

113. McElhany assured her she was not making a face about her.

114. As UTSW has a high attrition rate and low graduation rate, any suggestion that UTSW is admitting students who might not be able to succeed is redirected by Coleman to see if they are "mission fit," which is code for minorities.

115. At one time, Coleman told McElhany that if they need to finalize tie-brakers for interviews, Coleman and Howell-Stampley go into a room together and focus on "mission fit," which is code for minorities.

116. McElhany's friendship with Dr. Katzen made her a target.

117. On or about July 22, 2024, Isela Perez informed McElhany she heard Coleman referring to Dr. Katzen as "a racist" on several occasions.

118. Perez was upset by these comments and shared with McElhany that she was "concerned that you are being targeted by them because you are white and friends with Kirsten."

119. On or about July 25, 2024, McElhany sent an email to Howell-Stampley outlining her concerns that she was not being treated equitably in comparison to non-white PA faculty with clinical appointments.

120. During a review of student feedback on August 28, 2024, a student said they had received similar feedback from Howell-Stampley.

121. Howell-Stampley, Coleman, and Grubb, all became upset.

122. Howell-Stampley said, "They must be confusing me with someone else. All the students and people confuse us black people," or words to similar effect.

123. Coleman and Grubb agreed.

124. Coleman and Grubb then talked about how hard it is to be a black woman.

125. When Betancourt said that just recently a student had confused her and McElhany, Howell-Stampley and Coleman both said, “You don’t know what it’s like to be a black woman,” or words to similar effect.

126. Howell-Stampley removed McElhany from her clinical appointment with the UTSW Lung Transplant Team.

127. Chris Roe informed McElhany on October 21, 2024 that Howell-Stampley had prior knowledge of and involvement in the decision to remove her for several weeks preceding the action.

128. Following the loss of her clinical appointment, McElhany reported the matter to the Compliance Department, submitted a retaliation intake form on October 21, 2024, and fully participated in the subsequent investigation.

129. On February 14, 2025, Mary Bandoh, Investigator with the UTSW Office of Institutional Compliance and Audit Services, notified McElhany via email that her retaliation claim regarding the loss of her clinical position had been substantiated.

130. After being removed from the Lung Transplant Hospitalist position, McElhany was repeatedly denied opportunities to transition into other full-time clinical roles through the Office of Advanced Practice Providers, despite being qualified for those positions and having previously worked in one such role for nearly two years.

131. The loss of McElhany’s clinical appointment significantly hindered her opportunities for promotion and tenure within the UTSW institution.

132. McElhany ultimately was forced to resign her position as well because of the racially hostile work environment.

## VII.

## CONDITIONS PRECEDENT

133. Plaintiffs filed Charges of Discrimination with the Equal Employment Opportunity Commission and the Texas Workforce Commission.

134. The Charges were filed within 180 days after the date on which the complained of employment practices were committed.

135. Plaintiffs have timely exhausted all administrative remedies.

136. Dr. Katzen's Charge, filed after she was constructively discharged, asserted race and color discrimination and harassment, as well as unlawful retaliation.

137. McElhany's Charge, filed before she was constructively discharged, alleged race and color discrimination and harassment, as well as unlawful retaliation.

138. Because McElhany's Charge alleged pre-termination retaliation, her Charge automatically covered subsequent retaliation and her constructive discharge.

139. "[I]t is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim [in federal court] growing out of an earlier charge; the court has ancillary jurisdiction to hear such a claim when it grows out of an administrative charge that is properly before the court." *Gupta v. East Texas State Univ.*, 654 F.2d 411, 414 (5th Cir. 1981).

## VIII.

## CAUSES OF ACTION

### A. First Cause of Action—Race/Color Discrimination—Title VII

140. Plaintiffs incorporate each of the foregoing paragraphs.

141. UTSW discriminated against Plaintiffs because of their race/color.

142. UTSW allowed African American and other non-white employees to interfere with the terms and conditions of Plaintiffs' work environment.

143. Non-white employees were not called names, accused of being racist, told to attend meetings with persons who made them feel unsafe and threatened with physical violence, told to handle their own problems, and/or subjected to any of the other racist treatments identified above.

144. These actions affected the terms and conditions of Plaintiffs' employment.

145. UTSW's actions violated 42 U.S.C. § 2000e-2(a).

### B. Second Cause of Action—Race/Color Discrimination—Unlawful Termination—Title VII

146. Plaintiffs incorporate each of the foregoing paragraphs.

147. UTSW constructively discharged Plaintiffs because of their race/color.

148. Both Plaintiffs ultimately resigned their employment

149. UTSW's actions violated 42 U.S.C. § 2000e-2(a).

**C. Third Cause of Action—Race/Color Harassment—Title VII**

150. Plaintiffs incorporate each of the foregoing paragraphs.

151. Plaintiffs experienced unlawful workplace harassment that was sufficiently severe or pervasive to alter the terms and conditions of their employment.

152. UTSW allowed African American and other non-white employees to interfere with the terms and conditions of Plaintiffs' work environment.

153. Plaintiffs were called racist or privileged because of the are white—non-white employees were not.

154. Plaintiffs were told to attend meetings with persons who made them feel unsafe and threatened with physical violence—non-white employees were not.

155. Plaintiff were told to handle their own problems—non-white employees were not.

156. The actions of Coleman, Howell-Stampley, and other non-white employees affected the terms and conditions of Plaintiffs' employment.

157. Plaintiffs' workplace was filled with discriminatory intimidation and ridicule often instigated or encouraged by Coleman and Howell-Stampley.

158. Plaintiffs' workplace harassment was sufficiently severe or pervasive that Plaintiffs both felt they could no longer endure the harassment.

159. UTSW constructively discharged Plaintiffs.

160. UTSW's actions violated 42 U.S.C. § 2000e-2(a).

**D. Fourth Cause of Action—Unlawful Retaliation—Title VII**

161. Plaintiffs incorporate each of the foregoing paragraphs.

162. Plaintiffs engaged in protected activity as set forth in 42 U.S.C. § 2000e-3(a).

163. In response, UTSW retaliated against Plaintiffs and constructively discharged Plaintiffs.

164. UTSW's actions violated 42 U.S.C. § 2000e-3(a).

## IX.

## DAMAGES

165. Plaintiffs incorporate each of the foregoing paragraphs.

166. UTSW's actions violated 42 U.S.C. § 2000e-2(a) and 42 U.S.C. § 2000e-3(a), which entitle Plaintiffs to recover from UTSW back pay, front pay, as well as pre-judgment and post-judgment interest.

167. Plaintiff is also entitled to recover from UTSW compensatory damages as provided for under 42 U.S.C. § 1981a(a)(1).

168. Plaintiffs seek all damages available under federal law.

## X.

## ATTORNEYS' FEES AND COSTS

169. Plaintiffs incorporate each of the foregoing paragraphs.

170. Plaintiffs retained the services of undersigned counsel to prosecute their claims.

171. Pursuant to 42 U.S.C. § 2000e-5(k) and 42 U.S.C. § 1981a, Plaintiffs are entitled to recover a reasonable attorneys' fee from UTSW, including reasonable expert fees and costs.

## XI.

## INJUNCTIVE AND DECLARATORY RELIEF

172. Plaintiffs incorporate each of the foregoing paragraphs.

173. Plaintiffs request the Court enter an order providing injunctive and declaratory relief including, but not limited to:

174. Prohibiting UTSW from engaging in unlawful discrimination;

175. Reporting to the Court on the manner of compliance with the terms of a final order issued by this Court;

176. Paying court costs;

177. A declaration that UTSW violated Plaintiffs' rights under state and federal law, engaged in unlawful employment discrimination, and considered an illegal factor in terminating Plaintiffs' employment; and

178. Any additional equitable relief as the Court deems proper.

## XII.

## JURY DEMAND

179. Plaintiffs incorporate each of the foregoing paragraphs.

180. Plaintiffs demand a trial by jury.

## XIII.

## CONCLUSION AND PRAYER

181. Plaintiffs respectfully requests that UTSW be cited to appear and answer, and that upon final trial of this matter, the Court enter judgment against UTSW, awarding Plaintiffs:

A. Back pay and front pay (including benefits);

B. Compensatory damages;

C. Injunctive and declaratory relief, including but not limited to, an Order:

(i). Prohibiting UTSW from engaging in unlawful discrimination;

(ii). Reporting to the Court on the manner of compliance with the terms of a final order issued by this Court;

(iii). Paying court costs;

(iv). A declaration that UTSW violated Plaintiffs' rights under state and federal law, engaged in unlawful employment discrimination, and considered an illegal factor in terminating Plaintiffs' employment; and

(v). Any additional equitable relief the Court deems proper;

182. Courts costs;

183. Pre-judgment and post-judgment interest at the rate set by law; and

184. All legal or equitable relief this Court deems proper.

Respectfully submitted,

/s/ Matthew R. Scott

MATTHEW R. SCOTT
Texas Bar No. 00794613
matt@sgtlawgroup.com
JAMIE J. GILMORE
Texas Bar No. 24045262
jamie@sgtlawgroup.com
BRITTNEY L. THOMPSON
Texas Bar No. 24104618
brittney@sgtlawgroup.com
**SCOTT GILMORE THOMPSON PLLC**
Founders Square
900 Jackson Street, Suite 550
Dallas, Texas 75202
214-965-9675 / 214-965-9680 (Facsimile)
**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I certify that I served a copy of this document on all counsel of record through the Court's ECF system as of the date file marked thereon.

/s/ Matthew R. Scott
MATTHEW R. SCOTT